EX PARTE SCURRY FOSTER.

1. HABEAS CORPUS — SECOND APPLICATION. — An application for a second writ of *habeas corpus* must show that since the hearing in the first application important testimony has been obtained, which it was not possible to get at the former hearing. The application must also set forth the testimony so newly discovered, and if it be that of a witness, the affidavit of the witness must accompany the application.

2. SAME. — But such application is not limited to newly discovered evidence. The right is conferred in two classes of cases : 1. Where the applicant has obtained important evidence which, not newly discovered, it was out of

his power to produce on the former hearing. 2. Where the evidence is newly discovered.

3. Same. — It is not sufficient. that the second application be accompanied by the affidavit of the witness, but it must in all things conform to the rule governing applications for new trial based upon newly discovered evidence.

4. Same — Practice. — If the application does not in all things conform to this rule, the court below would be authorized to refuse the writ; and such action would be conclusive, for an appeal does not lie ·from the refusal of the lower court to grant the writ.

5. Same — Practice in this Court. — The court below having granted the writ, and, upon hearing the testimony, having ruled that it was not newly discovered, this court, even though it concurs in that view, will not for that reason, or because the applicant was not entitled to the writ, affirm the judgment refusing bail.   But, the writ having been granted and the proofs heard by the court below, and the evidence having become part of the record, on appeal this court is required to hear the facts and law arising thereon, and to enter such judgment and make such orders as the law and the nature of the case require.

6. Same. — This court is precluded from revising the action taken below on incidental questions in this class of cases.

7. Right of Bail. — The Constitution of 1876 provides that "all prisoners shall be bailable by sufficient sureties, unless for capital offences when the proof is evident."

8. "Proof is evident" if the evidence adduced on the application for bail would sustain a verdict convicting the prisoner of murder in the first degree; but if the evidence be of less efficacy, bail should be allowed him. In other words, bail is not a matter of right, if the evidence is clear and strong, leading a well-guarded and dispassionate judgment to the conclusion that the offence has been committed; that the prisoner is the guilty agent; and that, if the law be administered, he will be capitally convicted.

9. Practice in this Court. — The present case being held bailable, and the record disclosing the prisoner's ability to give bond in a certain sum, deemed reasonable, this court empowers the sheriff to take such bond, with sufficient sureties, and conditioned according to law, and directs that it be filed in the District Court having cognizance of the case.

Appeal from the District Court of Austin.    Tried below before the Hon. L. W. Moore.

The applicant in this case was charged by bill of indictment with the murder of Nicholas Umland, alleged to. have been committed in Austin County, October 13, 1878.

Sutton testifies, in substance, that his attention was first called to the difficulty, as he was going to the coffee-stand for a cup of coffee, by hearing some angry words near him, and discovered it was Umland (the deceased) and James Foster (a brother of defendant's), standing facing each other, when he heard Umland say, "If that is not sufficient, I am a man," or words of like import, and James Foster replying, "I am, too," or words of like effect. He (Sutton) went to them to make peace, and extended his hands forward and placed the back of his right hand against Umland and the back of his left against James Foster. He heard no other remarks between the parties, and knew by the tone of Umland's voice that he was mad. Just at this moment he saw a hand from his left side, in front, pass him and catch Umland by the right shoulder (Umland having his right hand in his pocket at the time), when he turned and saw that it was the defendant, Scurry Foster, with a pistol in his hand. Just at this time Umland made a plunge forward about two steps, or was jerked forward, and the pistol fired and Umland fell, wounded near the shoulder, and died about an hour thereafter. When witness first saw defendant he was almost directly behind or beside James Foster. All that he saw or heard occurred inside of a minute.

H. C. Ferris testified, in substance, that he and Umland were at the coffee-stand drinking coffee; Umland had finished, and was sitting off on a beer-keg, waiting for him. He was sitting upon another keg, about two feet from Umland. At this juncture James Foster came up, and Umland and he were talking. He heard Umland say, "I have made that up with you two or three times, but if you crowd me, or want anything more,"— or something to that effect, — "I am a man, and will defend myself." Foster replied, "I am, too." He (Ferris) then said to them, "Boys, boys, boys," and went on drinking his coffee.

The next thing he heard was the report of a pistol, and Umland exclaimed, "Ferris, I am a dead man." He then went to the place where Umland was lying, which was ten or twelve feet from where he (Ferris) had been sitting at the coffee-stand.

Upon cross-examination, this witness states that the first remark he heard from Umland, when he was talking with James Foster, was, "We have made friends over this two or three times, and what is the use of saying anything more about it," or something of that sort; and he thinks he further said, "If you want anything more, I am a man, and by G—d you can get it; I stand in my own shoes;" and James Foster replied, "I am a man, too." The first he saw of James Foster, he was standing near him and Umland, and both were talking. At first Umland was sitting, but when he made those remarks he rose up. James Foster and Umland were standing close together when he heard these remarks. At this time both were so near to him that he could have touched them. He did not see the pistol fired. Thinks the parties were ten or twelve feet from him when the pistol was fired, but he did not observe how they got from where they were when he first noticed them to where they were when the pistol fired. He (witness) was somewhat under the influence of liquor that night. Don't remember any one knocking his hat off that night, and telling him he meant no harm by it.

Joe Nichols's testimony: He was keeping a coffee-stand at the Piney school-house on the night of the homicide. Between three and four o'clock in the morning, Umland and Ferris came to the coffee-stand for coffee. Ferris drank two cups and Umland one. Umland had finished his cup, and Ferris was sitting there mincing his, with his head down, and during this time James Foster came up and slapped Ferris's hat off his head. Umland picked up the hat and put it back on Ferris's head, and said to Fos-

ter, "Don't be slapping Ferris's hat off that way; he might get mad." Foster replied, "I am not afraid of making Deacon Ferris mad; I have known him for a long time." Ferris raised his head then, and said, "No, there was no danger of his getting mad." Foster then said something to Umland, not understood by the witness. Umland then said, "Jim, I have made friends with you two or three times about that thing, and what is the use to keep bringing it up?" Umland then got up and said, "I am a man, and stand in my own shoes;" and Foster said, "So am I." Then the defendent, Scurry Foster, stepped up and said, "I am right here, ready for anything." Then Umland and Scurry Foster stepped off two or three steps from the coffee-stand, and there were some words passed between them, which the witness did not understand, after which Scurry Foster slapped Umland's jaws. Then Umland either struck him or pushed him. The motion was with the right hand, and seemed to be straight out from his body, and defendant either stepped back or the blow pushed or staggered him back; and as he stepped or staggered back he reached down in his breast and pulled out a pistol from his vest or coat pocket, inside, presented it, and fired, and Umland fell on his back, and said twice, "Charlie, I am a dead man." Witness heard the click of the pistol as it was cocked. Umland seemed to be in a good humor during the time he was sitting at the coffee-stand. While sitting at the coffee-stand with Ferris, Umland did not use any harsh or profane language about anybody, or make any threats. Saw nothing in Umland's hands during the difficulty. Don't remember that Ferris said anything to anybody while at the coffee-stand. They were sitting there half to three-quarters of an hour before Foster came up.

Upon cross-examination, the witness stated that when James Foster commenced the conversation with Umland he

seemed to be speaking privately, and in an undertone ; when Umland got up, and said, "Jimmie, we have settled that two or three times, and what is the use of bringing it up again, or throwing it up to him, or keeping talking about it," — or something to that effect — "that, by G—d, he was a man, and stood in his own shoes." At this time Scurry Foster came up, and said, "He was here, and ready for anything ;" and without any further remarks, Scurry Foster and Umland retired six or eight feet from the counter and engaged in a conversation he did not understand, when Scurry Foster slapped Umland's jaws, etc. Saw Sutton, who seemed to be trying to keep Scurry Foster and Umland apart. When he first noticed Sutton he put a hand on Umland and a hand on Foster, and then the slapping was done, and Umland either struck or pushed him. Did not see anybody in the group at this time except Umland, defendant, and Sutton. Did not see anybody catch Umland by the shoulder, and give him a jerk. Thinks he would have seen it if it had occurred.

C. H. Brossman's testimony : He was a brother-in-law of Umland, and witnessed the homicide. While going from the school-house towards the coffee-stand, heard Umland make the remark, "I am a man, and stand in my own shoes." Was six or eight steps from Umland at the time. The remark attracted his attention to the party. Some reply was made by a person standing in front of Umland, that he did not hear. There were three persons in the group besides Umland. As the remark was made, he saw some one of the three stepping between them, and a motion of his hands as if trying to keep them apart. He then saw one of the party, the one furthest from Umland, advance towards him ; saw the barrel of the pistol, the flash, and the fall of Umland. The pistol was in the hands of the party who advanced, and at the crack of the pistol Umland fell.

When the pistol fired, did not see Umland striking with his hands. Thinks if he had been, he could have seen it. He was excited at the time.

The State also introduced John B. Lewis, deputy-sheriff of Austin County, and the officer who arrested Scurry Foster upon the spot at the time of the homicide, who testified that about an hour or more previous to the homicide he saw deceased having a quarrel with some other parties, and that he had an open pocket-knife in his hand, and that he (the sheriff) requested him to put up the knife; and he replied that he was not armed, that he only had a pocket-knife, and he thought he had a right to keep that in his hand. He then ordered him to put the knife in his pocket, which he did. The knife was an ordinary pocket-knife, with a blade some two or three inches long. After the killing, Mr. Lang-hammer showed me a knife having the same appearance as the knife I saw Umland have. Ordinarily, I would take it for the same knife. That he was standing in the vicinity of the shooting at the time it occurred, and saw the flash of the pistol; that Foster, after the pistol fired, stepped rapidly backward five or six steps and stopped, and by the time he had stopped he caught hold of him, and wrested the pistol from his hands; that he seemed to be very much excited when he first got hold of him, and said he would shoot any man that tried to cut his throat; that he examined the wound upon Umland. The shot penetrated between the right nipple and collar-bone. The wound seemed to have been slanting, and not directly in front, and ranged in. Previous to the shooting, he had seen Umland take several glasses of beer, and thinks he was somewhat, though not much, excited from drinking.

E. R. Thomas, a witness for the State, testified that he examined the body of the deceased the morning after the homicide, and found a wound on the right side of the body, just below the collar-bone. He examined carefully the

wound.   It ranged towards the left and centre, across the body.

J. A. Traylor, witness for the State, testified that defend-ant and Umland had some quarrelling and harsh words at a bar-room in Chappell Hill, last Christmas.   Witness, as a peace officer, suppressed the quarrel, and Umland went off over across the street, and said something back to defend-ant, such as that he had acted the d—d rascal, or d—d scoundrel; and Foster replied that he was not able to fight him, but that he would see him another time.   The parties were both in drink at the time, and they got together the next morning, through the intercession of friends, and settled their quarrel, and made friends and shook hands over the settlement.   Witness saw the parties meet about two weeks afterwards, and their meeting was friendly.   Umland, when drinking, was sometimes inclined to be quarrelsome. Witness had known of his having several fights.

W. P. H. Tatum also testified to substantially the same facts as Traylor.

The testimony alleged to have been newly discovered, and upon which the second application is based, is that of the witnesses T. J. Estes, Japhet Collins, James Manning, Henry May, J. W. Moss, Peter Anderson, John Foster, and John D. Cochran, all of whom were at the ball on Piney on the night of the homicide.

Estes testifies that between ten and eleven o'clock in the night he saw Umland show H. C. Ferris a large pocket-knife, and heard him say to Ferris, " This is the only weapon I have, but I will use it;" and that later, between one and two o'clock, he heard Umland and Ferris talking together some time in a low tone, all of which he did not hear (they being three or four feet from him, sitting on a bench), and, while talking, Umland drew from his pocket a knife, and said, " I have no other weapon but this ; but you know, Deacon, I am no coward, and am afraid of no man;" and,

with an oath, said, "I will use it on him." Witness did not hear distinctly the name of the party upon whom the knife was to be used, but from the conversation he believed it to be Scurry Foster.

Japhet Collins testified, in substance, that he was some twelve or fifteen feet from the parties at the time of the homicide, and his attention was attracted to them by loud talking; that he saw James Foster, Scurry Foster, and Umland standing close together; that he saw a motion of the hands between the parties, and immediately he saw defendant going back, and Umland following him up, and that he was advancing at the time the pistol fired; that James Foster seemed to be trying to keep Umland back and prevent a difficulty; that when he first noticed them, James Foster was between Umland and Scurry Foster, but before the pistol was fired Umland had either pushed him aside or passed him. As soon as Umland fell, he (the witness) sprang to him, and heard him say, "I am a dead man;" and also heard Foster (defendant) say "that he would shoot any man that tried to cut his throat;" this remark of defendant's was made immediately after the firing, and just as Umland fell to the ground.

James Manning testified that sometime during the night of the homicide, about eleven o'clock, he was passing by where Umland and Deacon Ferris were sitting on a bench, and he heard Umland say, "If he bothers me, or if he bothers me again, I will stick this in him." That the remarks were made in an angry manner, and seemed to be in earnest. The witness did not know who it was that he was speaking about, nor what it was that he was going to stick in him.

Henry May testifies that he saw the killing, and was about ten or fifteen feet from the parties at the time, and heard them talking, and they seemed to be quarrelling. Scurry Foster said, "Claus, I don't want to have any diffi-

culty with you ;" and Umland replied, " I don't care a
d—n. I will cut your d—d throat," and made a lick at
Foster with the knife, which was either a large pocket-
knife or a dirk ; he could not say which, as he only saw the
blade.    When Umland struck at Foster with the knife,
Foster began to retreat, and retreated about six feet before
he fired at Umland, Umland following him up, still striking
at him with the knife.    He cut at Foster two or three times
before the pistol was fired.    This occurred near the coffee-
stand.    There were several persons standing near by, but
could not say who they all were.    When he first saw the
parties James Foster was between them.    When the pistol
was fired no one was between them.

J. W. Moss testifies that he was near the parties at the time
of the homicide ; that his attention was called to them by
loud talking, when he turned and saw Scurry Foster back-
ing and retreating from some one he did not know, but whom
he was afterwards told was Claus Umland.    It was the same
party who was killed.    That after Foster had retreated five
or six feet he fired  at the deceased, who seemed to be
advancing towards Foster when the pistol fired.    He could
not distinguish the words used by the parties.    Foster did
not fire over or around the shoulders of Thomas Sutton or
any one else.    James Foster was between the parties when
he first saw them.    He could not say positively that
deceased was walking towards Foster at the time he was
shot, but he seemed to be advancing upon him.

Peter Anderson testifies that about five minutes before
the homicide he saw defendant and deceased standing talk-
ing together, and heard defendant say to Umland, " I don't
want any trouble with you ; " and Umland replied, " You
d—d s—n of a b—h, I'll cut your throat from ear to ear."
He seemed to be angry, and had a knife (which he took to be
a pocket-knife) in his hand at the time, holding it a little
behind him.    After Umland was shot, he saw a man come

up to the body and stoop down and take a knife out of or from near the right hand of deceased, and walk off with it.

John Foster testifies that he saw the pistol that was exhibited at the examining trial as the one with which the killing was done. It was his pistol; and about eleven o'clock in the night he lay down upon a bench and went to sleep, and while asleep, some one took from his person the pistol, and his watch and chain. He got his watch and chain from Scurry Foster, the next morning after he was arrested. He is a cousin of defendant's. Had owned the pistol about three years. Did not claim the pistol at the examining trial. He supposed it had been confiscated.

John D. Cochran testifies that he knew John Foster's watch and chain, and that about twelve o'clock of the night of the homicide Scurry Foster came to him, from towards where John Foster was asleep on a bench, and showed him John Foster's watch and chain, and told him that he had taken his watch and chain and pistol from his person, to keep any one from taking it from him. He did not see the pistol.

Upon the question of the testimony of these witnesses being newly discovered, none of them testify that they had informed either defendant or any of his attorneys of the facts they could testify to, previous to the trial of defendant, upon his first application for *habeas corpus*.

Witness May, upon cross-examination, testifies that he had not mentioned what he knew to any one, except his family, until a week before his testimony was given.

Witness Collins, upon cross-examination, testifies that he was called upon at the examining trial as a witness, for the purpose of identifying Claus Umland as the man who had some words or a difficulty with a Mr. Calhoun on the night he was killed, but was not examined in reference to the difficulty between Umland and Foster; that he never told defendant, or either of his attorneys, that he knew anything

about the circumstances of the homicide until after the first trial upon *habeas corpus.*

Witness Estes, upon cross-examination, testifies that it was some three or four days or a week after the homicide before he spoke to any one about what he had heard. Then he told N. Cochran and Miller Francis about it. It was after the examining trial that he told it. Don't know whether it was after the first trial upon *habeas corpus* or not. He had not tried to keep it a secret.

None of the other witnesses stated nor were questioned in regard to the time when they first communicated what they knew about the homicide.

Foster, in his second petition for writ of *habeas corpus,* states that the testimony of these witnesses has been discovered since his first application; and he swears to the truth of his petition.

James Foster testifies that he is a brother of defendant's, and that he was present when Umland was shot; that in passing from the school-house to the beer-stand, he saw his brother, Scurry Foster, Ferris, and Claus Umland at the coffee-stand. He heard a loud voice, and recognized it to be that of Umland, and knowing his disposition when drinking, he went there and found Umland and defendant quarrelling, and he caught hold of defendant and pushed him back and told him to go away, that he would talk to Umland. He asked Umland what they meant by quarrelling; that they were old friends, and there was no use in having a row. Umland then got up from his seat, and said, " I am a man, and stand in my own shoes, and will cut his G—d d—d throat," and rushed towards defendant, and struck over witness's left shoulder at defendant with a knife. Witness stopped him, and told him he was a man, too, and that they were all men, and don't want any row. Umland then made a second attempt to go to him, and caught witness by the coat with his left hand and made a lick at defendant

with his right hand, and immediately after that the pistol fired. When he first went up to the coffee-stand, where Umland and defendant were talking, Umland was sitting down sideways towards the coffee-stand, with an open knife in his hand, with the blade turned back. When Claus and my brother were quarrelling at the coffee-stand, they seemed to be angry. The first that attracted his attention was Umland cursing. He did not hear what defendant said, as he did not give him time before he pulled him away. Witness had a cut in his coat, in front of the lower right hand pocket, and did not know how it came there, unless done by Umland at the time of the difficulty. It was a new, thick, woollen coat. He had not stopped at the coffee-stand before during that night. He had not knocked off Ferris's hat, or put his hand upon his face in any way that night at the coffee-stand. Did not know nor never had heard of any previous trouble between defendant and Umland. They had known each other about fifteen years. As he (witness) was talking with Umland, he saw Sutton standing two or three feet off. The knife Umland had in his hand seemed to be a pocket-knife, with a buckhorn handle. He held it in his right hand.

Kinchen Collins testified that he was at the barbecue and ball at the Piney school-house, on the night of the homicide, and saw Claus Umland there. He last saw him at the beer saloon, some twenty or twenty-five minutes before the shooting, and thought he was considerably intoxicated. The last time he saw him, he was sitting at the coffee-stand upon a lager beer keg. Between three and four o'clock in the morning, and not exceeding fifteen minutes previous to the shooting, witness drove up to the beer saloon to get his brother, and Umland came up to his buggy, where he was sitting, and among other subjects of conversation, said "that he and Scurry Foster had had a difficulty, and that it was not over with yet; and that if it came up again, he

was going to hurt somebody, and hurt somebody d—d bad." About twelve o'clock that night he saw a difficulty between Umland and Mr. Floyd, and Umland had an open knife in his hand, and held it behind him. Witness saw the knife. It had a buckhorn handle, not very new, and whetted up pretty sharp. Witness was then shown a knife, claimed to have been taken by Sheriff Langhammer from Umland, after he was shot, and stated that he thought that it was the same knife he saw Umland have. He did not speak of the conversation with Umland until after the shooting.

Frank Ford testified that he was at the barbecue and ball at Piney school-house, and, as he supposed, about three-quarters of an hour before the shooting, he passed by Umland and Ferris, sitting at the coffee-stand, and heard Umland remark "that he intended to cut Scurry Foster's d—d throat before day." He did not know Umland at the time. He (witness) passed on, and soon met Scurry Foster, and told him of the remark, and he asked who it was, and he turned around and pointed out the man to Foster that had made the threat alluded to, and Foster informed him who the man was. There was a large crowd on the grounds at the time, and people were constantly passing and repassing.

Levi Rogers testified that he resided at Chappell Hill. Had known Claus Umland for quite a number of years. The Friday night before the Saturday night that Umland was killed, he saw him at a grocery in Chappell Hill, and Umland told him (the witness) that he was going down into Austin County to attend a barbecue and dance, and that he didn't know that he ever would get back again, but that he was going prepared. Umland, when in drink, was inclined to be quarrelsome.

Charles Langhammer testified that he was the sheriff of Austin County, and was about fifteen or sixteen feet from

Umland at the time he was shot; that he went to him in
about ten minutes after he was shot.   Did not notice the
position of his hands at the time.   He then went off, and
returned again in not exceeding five minutes, and found
him lying on his back, and his left hand resting on his
body.   He had a knife in his left hand.   The knife was
open.   (The knife was here exhibited.)   The knife was in
such a position that he did not see it until he raised the
hand.   Does not know which way the blade was pointed,
nor whose knife it is.   It is the same knife he had shown to
John Lewis.   Would judge the blade to be from two and
one-quarter to two and one-half inches long, and the handle
about three inches long.

Upon cross-examination, witness said he did not know
how the knife came in Umland's hand.   The knife was loose
in the hand.   When he raised the hand the knife came with
it, but there was no resistance when he took the knife out.
There were a great many people around when he took the
knife out of the hand.   There had been a great many people
around the body whenever he approached it, going and
coming.   The knife is one that had been used a good deal;
has been whetted up, and is considerably worn.   Noticed
Ferris washing the face of the deceased.   He took Umland
to be dead when he took the knife out of his hand.

Lucien Collins testified that, about a half-hour before the
shooting, he saw H. C. Ferris sitting on a lager beer keg at
the coffee-stand, and he took him to be drunk.   He (wit-
ness) stepped up, and slapped him on the back or shoul-
der, and said, " Hello ! Ferris, what are you doing here?"
and he replied, "I am just resting myself."   Witness
wanted to talk to him, but he did not seem to notice much,
and he went off and left him.   He was then in a stupid con-
dition.   Could not say whether it was caused from drinking
or want of sleep.   Had seen Ferris about two hours before

the homicide.     He was drinking, but did not notice his being intoxicated then.

John D. Cochran testified that he saw H. C. Ferris about two hours before the shooting.     Had some conversation with him, and thought he was considerably intoxicated.

G. E. Miller testified, for the State, that he saw Umland inside of three minutes after he was shot.     He was still alive, and his hands lying out from the body on the ground. They were neither clenched nor open.     The palms of the hands were up.     The right hand was over a foot, and the left four or six inches from the body.     Did not notice anything in his hands ; nor did he notice, in particular, to see if anything was in his hands.     From the position of his hand, did not think it would have held a knife if it had been raised over on his body.

*J. P. Bell* and *Chesley & Haggerty*, for the appellant. Scurry Foster stands charged with the murder of Claus (or Nicholas) Umland, in Austin County, on October 13, 1878.

He was arrested at the time of the homicide, and committed to the county jail of Austin County by the committing magistrate, sitting as an examining court.

October 31, 1878, District Judge L. W. Moore, on the hearing in chambers upon return of writ of *habeas corpus*, refused to grant bail to said Foster.

At the December term, 1878, of the District Court of Austin County, he was indicted for the murder of Umland, and the case was continued.

January 29, 1879, a second writ of *habeas corpus* was applied for by Foster, and awarded by Judge Moore, upon the ground of newly discovered testimony ; and, upon the hearing in chambers, bail was again refused, and Foster brings the case to this court by appeal.

The fact of the commission of homicide is conceded, and appellant, predicates his right to bail under the law, upon the following propositions, viz. :

*First,* That there is not sufficient testimony, as exhibited in the record, to make out an " evident " case of express malice upon his part in the commission of the homicide.

*Second,* That the court, in chambers, erred in refusing to pass upon and consider the material and alleged newly discovered testimony upon which the second application for bail is predicated, upon the ground that; in the opinion of the court, it was not in point of fact newly discovered, and that the same, if it had been considered, would have necessitated the granting of bail.

*Third,* That the testimony concerning the facts of the homicide, as exhibited in the whole record, shows affirmatively the absence of express malice.

. We will premise the statements in connection with these propositions by the general statement that the homicide, according to the testimony of all of the witnesses, occurred late in the night-time, upon the occasion of a public barbecue in the day-time and ball at night, given in the open air, at the Piney school-house, about two miles from Bellville, on the day and night of October 13, 1878, at which there was a large crowd of persons in attendance, and was committed openly, without any attempt at concealment or escape, and in the presence of numerous bystanders. Beer had been drunk freely upon the ground during the night, and adjacent to the beer-stand was a coffee-stand, each of which was reasonably well lighted.

Authorities under first proposition : Bill of Rights (Const. 1876), art. 1, sec. 11 ; Pasc. Dig., arts. 2266, 2267 ; *McCoy* v. *The State,* 25 Texas, 33 ; *Ake* v. *The State,* 30 Texas, 466 ; *Farrer* v. *The State,* 42 Texas, 265 ; *Murray* v. *The State,* 1 Texas Ct. App. 417 ; *Plasters* v. *The State,* 1 Texas Ct. App. 673.

Statement under second proposition : The court, in the certificate of approval of the statement of facts, qualifies the approval " with the explanation, that the only new testimony introduced was that of the witnesses whose names appear in the application ; and, though admitted, was not deemed by me as newly discovered, so far as material."

Also, in the judgment, the court recites : " It appearing to the court that the evidence introduced by the applicant, alleged to be newly discovered, was not in fact such evidence, and accordingly not sufficient to authorize the court to change the former judgment of the court refusing bail, and for other sufficient reasons, it is ordered and adjudged by the court that the prisoner, Scurry Foster, be remanded to the custody of the sheriff," etc.

Authorities under second proposition : Pasc. Dig., art. 2585–2588, 2625, 2627, 2641, 2642 ; 2 Pasc. Dig. of Dec. 359, sec. 14, and cases cited ; *Hibler* v. *The State*, 43 Texas, 199 ; Cooley's Const. Lim. 347 ; Freem. on Judg., sec. 324 ; 1 Bla. Com. 134–136 ; 3 Id. 133–138.

Statement under third proposition : In support of this proposition, we refer to the statements under the two preceding propositions ; also, to the testimony of the witnesses James Foster, Kinchen Collins, Frank Ford, Levi Rogers, Charles Langhammer, Lucien Collins, and John D. Cochran, witnesses for defendant ; which testimony was introduced by defendant before the examining court, and was given in evidence before the district judge upon both trials upon *habeas corpus*. Also, the testimony of G. E. Miller, a rebutting witness, offered by the State upon the examining trial, and whose testimony was before the district judge upon both applications for bail.

Authorities : Same as under first proposition ; *Primus* v. *The State*, 2 Texas Ct. App. 369.

*Thomas Ball*, Assistant Attorney-General, for the State.

WHITE, J.   This appeal is from a judgment rendered upon a second application for *habeas corpus*, refusing bail to applicant.   The first application was made and heard before indictment found, and the application in this case after indictment.   Applicant's right to a second writ of *habeas corpus* was based upon the ground of newly discovered evidence.

Upon the hearing in chambers, the district judge rendered the following judgment, viz. : " It appearing to the court that the evidence introduced by the applicant alleged to be newly discovered was not in fact such evidence, and accordingly not sufficient to authorize the court to change the former judgment of the court refusing bail, and for other and sufficient reasons, it is ordered and adjudged by the court that the prisoner, Scurry Foster, be remanded to the custody of the sheriff of Austin County, to be by him confined, without bail, to answer the indictment preferred against him by the grand jury of said county, charging him with the murder of Nicholas Umland," etc.

With regard to second applications for the writ of *habeas corpus*, our statute reads thus : " A party may obtain the writ of *habeas corpus* a second time by stating in the application therefor that since the hearing in his first application important testimony has been obtained, which was not in his power to produce at the former hearing.   He shall also set forth the testimony so newly discovered ; and if it be that of a witness, the affidavit of the witness shall also accompany such application."   Pasc. Dig., art. 2642.

A casual reading of the language of this statute might lead to the inference that such second applications would be limited exclusively to evidence which was newly discovered. Such, however, is not our interpretation, based upon a proper construction of the whole article, and, as we think, in perfect consonance with the broad principles of justice and human liberty upon which the writ is founded, and for

the better protection and security of which its privileges were intended mostly to subserve. We are of opinion that the statute intended to confer the right in two classes of cases : First, where important testimony has been obtained, which, though not newly discovered, or which, though known to him, it was not in his power to produce at the former hearing ; second, where the evidence was newly discovered.

In either case his application, if it be on account of the testimony of a witness, should not only be accompanied by the affidavit of the witness, but the reasons why the testimony was not adduced should be fully stated, in order that the judge or court to whom the application was addressed might know, in the one case, why it was out of his power to produce it at the former hearing, and in the other, such facts stated as would satisfy the court that the failure to discover the testimony was not attributable to any lack of proper diligence on his part ; in other words, the application should be so full and complete as to apprise the court of all the facts necessary to be known, that it might act advisedly in granting or refusing the application.

We cannot better, perhaps, illustrate our idea than by the facts presented in the case at bar. As we have seen, the application was upon the ground of newly discovered evidence. In such a case, we take it, all the recognized rules with reference to newly discovered testimony on motions for new trials would obtain and govern. The showing should be the same. If the showing itself discloses, we will say, want of diligence, or that the evidence is cumulative, or that it was intended to impeach a witness, or any other fact which whould render it insufficient or invalid on a motion for new trial, then the judge or court would be fully authorized in refusing the writ, and his refusal would be conclusive ; for an appeal does not lie from the refusal of a district judge to grant a writ of *habeas corpus*.

*Ex parte Ainsworth*, 27 Texas, 731; *Thomas* v. *The State*, 40 Texas, 6.

In this case, however, the judge granted the writ; and then, upon the hearing, determined that the evidence was not newly discovered. A question is here presented which has never before arisen in this State, and that is, What should be the practice in this court on appeal, even supposing the court should concur in the view of the District Court that the evidence was not newly discovered? Will we affirm the judgment because the party was not primarily entitled to the writ? Clearly not. Having granted the writ and heard the testimony, the evidence thus heard becomes part of the facts of the record. The rule of practice as prescribed by the statute applies: "The Supreme Court [Court of Appeals] shall hear the appeal upon the facts and law arising upon the record, and shall enter such judgment and make such orders as the law and the nature of the case may require." Pasc. Dig.; art. 3221. "The opinion of a district or supreme judge shall not be revised as to any incidental question which may have arisen on the hearing of the application for *habeas corpus*, the only design of the appeal being to do substantial justice to the party appealing." Pasc. Dig., art. 3222.

The case, then, must be determined by us, not upon the question as to whether the evidence is newly discovered, but upon the evidence as we find it adduced on the hearing and presented in the record.

Taking the record as an entirety, and considering all the testimony as it here appears, is the prisoner entitled to bail? Our present Constitution provides that "all prisoners shall be bailable by sufficient sureties, unless for capital offences when the proof is evident." Const., art. 1, sec. 11. What is the proper definition to be given and the legal interpretation to be placed upon the words, "when the proof is evident," as used in the constitutional provision quoted,

has been a most fruitful source of discussion with the legal profession of the State since the adoption of the Constitution of 1869, where the same language is used as in the present Constitution. No legal construction has ever been directly given it. In the case of *Ex parte Rothschild*, 2 Texas Ct. App. 560, this court promised to avail itself of the first suitable case to discuss the meaning of these words, and to declare the rules which would regulate and govern the action of this court in its adjudications upon *habeas corpus* cases.

In *McCoy* v. *The State*, 25 Texas, 33, our Supreme Court gave their interpretation of the meaning of the expression, " proof is evident or presumption great," as used with reference to bail, in the ninth section of article 1 of the Constitution of 1845. Roberts, J., says : " The terms * *. * are as definite to the legal mind as any words of explanation could make them, and are intended to indicate the same degree of certainty, whether the evidence be direct or circumstantial. The design is to secure the right of bail in all cases, except in those in which the facts might show with reasonable certainty that the prisoner is guilty of a capital offence."

The omission of the words, " or presumption great," and the use of the expression, " proof is evident," in the present Constitution, it is contended, materially change the rights of a prisoner, and require, to justify a refusal of bail, the establishment of a much more direct and certain case of guilt than formerly. Doubtless this is so. Some, however (able lawyers), go to the extent of insisting that a mere conflict of testimony will necessarily entitle a party to bail, since that cannot be said to be evident which admits of dispute ; and the case of *Ex parte Miller*, 41 Texas, 213, is frequently cited in support of this position. When examined with reference to the facts of the case before the court, and which were the facts to which alone the language of the

opinion relates, or even independently considered, we do not think the rules therein laid down warrant such construction.

Again, it is insisted that the only true and correct meaning of the word " evident " is that ·given it by lexicographers whose works are recognized as of standard authority. Take, for instance, the definition given by Webster, and we believe his definition is about the same as that of most standard authors. He defines " evident " to be, " *clear to the mind;* obvious ; plain ; apparent ; manifest ; notorious ; palpable." This is very satisfactory, is doubtless accurate and correct, and, as we shall endeavor to show hereafter, not inconsistent with our view of the constitutional expression, " proof is evident," even when subjected to philological construction. Perhaps we cannot succeed better in making ourselves understood than by declaring the general rules which will control and govern us in refusing bail, under the constitutional prohibition, than by attempting to announce a definite abstract meaning for the constitutional expression, which is not easily defined.

The Supreme Court of Pennsylvania have laid down a rule upon this subject which we think worthy of approval. In *The Commonwealth* v. *Keeper of Prison*, 2 Ashm. 227, it is said to be " a safe rule, where a malicious homicide is charged, to refuse bail in all cases where a judge would sustain a capital conviction, if pronounced by a jury, on such evidence of guilt as was exhibited to him on the hearing of the application to admit to bail ; and, in instances where the evidence of the Commonwealth is of less efficacy, to admit to bail." 2 Ashm. 227 ; Hurd on Habeas Corpus, 438 ; *The State* v. *Summons*, 19 Ohio, 139 ; *Ex parte Bryant*, 34 Ala. 270.

The same idea is tersely and happily expressed by Brickell, C. J., in *Ex parte McAnally*, 53 Ala. 495. He says : " If the evidence is clear and strong, leading a well-guarded and dispassionate judgment to the conclusion that the offence

has been committed ; that the accused is the guilty agent ; and that he would probably be punished capitally if the law is administered, bail is not a matter of right." See also *Ex parte Nettles*, Sup. Ct. Ala., A. D. 1878.

We know of no better exposition of our views with regard to the proper construction of the constitutional expression, "proof is evident;" than the two rules quoted ; and when subjected to strictest criticism, we cannot see that they are in anywise inconsistent with the definition quoted from Mr. Webster. Besides this, they furnish ample restrictions to regulate and govern the action of the courts in their adjudications upon questions of bail in capital cases.

When we apply the doctrine thus enunciated to the facts in evidence, as shown in the record before us, we are not satisfied that "the proof is evident." Consequently, we believe that the applicant is entitled to bail. We do not wish to be understood as saying that he is not guilty of murder in the first degree, and that this fact may not be made to appear most fully upon his final trial. We are only passing upon the sufficiency of the evidence as exhibited in this record, and upon it alone is our opinion predicated. We will not comment upon it, lest our comments should influence the final trial ; to decline to do so is the uniform practice, as it has always obtained in such cases.

In the record we are furnished with an agreement of counsel for the State and applicant, that applicant can give a bond in the sum of $5,000. The court have, therefore, concluded that the sum of $5,000 would be proper in the premises. It is, therefore, ordered and adjudged by the court that the applicant, Scurry Foster, be admitted to bail in the sum of $5,000, with good and sufficient sureties, and that this judgment of the court be certified to the sheriff of Austin County, the officer having custody of said applicant, who is authorized and empowered to receive a bail-bond for

that amount, properly executed, and conditioned as the law requires; which said bail-bond, when so executed and approved by said sheriff, shall be filed by him in the District Court of said Austin County.

*Bail granted.*